We move for the third case, or the second case this morning, Martinez v. City of Chicago. Mr. Kozakiewicz. May it please the court, my name is Jared Kozakiewicz on behalf of the appellant Daniel Martinez. I'm requesting to reserve five minutes of my time for rebuttal. Mr. Martinez appeals from the denial of his post-trial motions for judgment as a matter of law. Under Rule 50 and for a new trial under Rule 59. Limits on the Fourth Amendment, on police authority under the Fourth Amendment, must be respected. And the reason that they exist and what they're designed to do is to prevent interference with the liberty interests of innocent people. They're designed to protect the privacy interests of people who don't want to be bothered by the government. And when they are not respected, what happens is the police invade the privacy interests of the wrong people. They arrest the wrong people. They search the wrong areas and the wrong people get prosecuted. That is what happened in this case. Officer Weber arrested the wrong person in the wrong place under circumstances that are hotly disputed in the trial. Believe it or not, at one time this case was extremely simple. Officer Weber claimed that 10 to 15 police officers were inside of Daniel Martinez's house. And he entered to join a hot pursuit in progress. During the discovery phase, unfortunately for Officer Weber, the defense realized that the building which Officer Weber entered was in fact two units. And that all of the officers who claimed to have entered that building entered the other unit. At trial, the defense began to shift their defenses. And they offered multiple justifications for the entry. They offered multiple justifications for Mr. Martinez's seizure, all in a desperate effort to avoid what was obvious. There wasn't 10 to 15 officers inside the home when Officer Weber entered it. In fact, by the time that Officer Weber entered, which was established at trial, all of the officers inside that building had left the building. They had begun to establish a two-block perimeter around the area where they were searching for the offender fleeing with a gun. And by the time Officer Weber even arrived at the scene, the police had entered the yards. And as indicated in the facts, Officer Weber's partner says to him, let's go hit these yards over here because that was where they thought the suspect was hiding. And in fact, the suspect had run in and out of the other unit, jumped a fence and hid in the garbage can. So instead, at trial, the defense tried to present a defense that Officer Weber entered the wrong house by mistake. He didn't realize which house he was going into, even though the proper address was given over the radio numerous times. He just didn't hear it. And it was just a big accident. The problem with that defense is that it isn't based on the facts that were known to Officer Weber or what he claims he knew. What he claims he knew was that he saw 10 to 15 officers who were in hot pursuit inside the unit he entered. So whether or not the building, and we've conceded for the purposes of appeal that it is impossible to tell that the building contains two units, it looks like one from the outside, it doesn't matter. Because when we evaluate under the objective standard for probable cause, whether it existed, we look at what facts the officer claims he knew. And if he knew that there were 10 to 15 officers inside that house in hot pursuit, this search was justified. No question about it. Unfortunately, that did not become the trial. And that was not what it was about. And that defense was effectively abandoned at the trial. It was not argued in closing argument. There were no corroborating officers who came to Officer Weber's defense. In fact, at one point, Officer Weber asked during the trial, why would I find any officers to corroborate my story? Indeed, he could not, because there were none. And even the officer who he tried to claim was there, Officer Nunez, says he was not inside the unit that Officer Weber searched. And when you read the brief of the appellant, it becomes clear that their argument in favor of probable cause is not really an argument in favor of probable cause. It is nothing but a thinly veiled confession that probable cause did not exist. And the reason is because, like on page 19 of their brief, they talk about how Officer Weber could enter the house by mistake because of the layout of the backyard. Problem is, is Officer Weber had never in his life been in that backyard. He had no idea what it looked like. Those were not facts available to him. He did not know. He speculated, certainly as page 20 highlights, that sometimes suspects double back. So it was OK to enter that house because what if the guy had doubled back? Problem is, is there's no evidence in the record that the suspect doubled back. And in fact, the suspect didn't. He was seen running out of the back door of the home. And although he wasn't seen, they believed he jumped the fence. And in fact, that's where they found him. And speculation cannot form the basis of probable cause. Just because it's possible that a suspect might do something doesn't mean that officers are entitled to go inside someone's house. So then again, on page 24, the defense argues he had been seen exiting the rear of the building. But sometimes they went, they double back. So Officer Weber went in anyways. But again, Officer Weber has no knowledge of what transpired behind the home. And he cannot use that to support an argument for probable cause. And that is why the judge in this case issued erroneous jury instructions to the jury on the exiting circumstances. I'm supplying a very long, very detailed instruction on all of the defense theories of exigency in this case, including mistake and escape, both of which were improperly given. They created a lot of confusion in the trial. It was extremely prejudicial because it wasn't the prima facie case that Officer Weber had offered pretrial. And the district court ought to have granted judgment to Mr. Martinez as a matter of law because there was no evidence of 10 to 15 officers inside that home when Officer Wenner offered during the trial. And even if that's not the case, the manifest weight of the evidence, given the defense's own presentation, was that there were not 10 to 15 officers. At a minimum, he deserves a new trial on that claim. Counsel, you make mention on page eight of your reply brief of this theory, the obstruction theory. And you talk about it as you have a quote from Judge Dow where it's a novel theory. You're obstructing me because you're keeping me away from my other job. I've never heard that theory before. Which particular jury instruction was that with regard to? Was it the ones you just mentioned? No, the instruction was not. That would be the probable cause instruction and the malicious prosecution instructions that you're referring to. There was no instruction actually given as to whether that was a valid theory. The defense was actually just allowed to argue that when an officer radios for help, that any officer who responds is the victim of obstruction, which is completely insane. An officer who radios for assistance and then takes another officer away from his job to come aid. Remember, the circumstances here is that Mr. Martinez is confronted by a police officer in his living room by himself, an officer who he is at present suing for civil rights violations at the same home. And he tells him to get out of his house and argues with him about his authority to be there, at which point Officer Weber radios for help. And based on that radio call, the defense is arguing and presented to the jury argument that that was sufficient for probable cause for obstruction of justice, which of course is ludicrous. There is no authority for that. They provided none to the district court. They provided none to this court, and yet they continue to maintain that the police have the authority to arrest and prosecute somebody whenever they call someone for assistance, even under innocent circumstances like these. Even if it were true that 10 to 15 officers were inside this home when Officer Weber entered, as he testified and admits, when Daniel enters, no other officers are inside the home. He's there by himself, armed with a very limited amount of information. And if he continued to occupy the home after the small house had been searched room to room and was standing in the main area of the house by himself, that would be unlawful, because any probable cause that may have existed to believe that the suspect was in the house at that point had dissipated and was over. And that is why the officers, having seen him run through the back door, were searching the yards and establishing a two-block perimeter. And then finally, next you get to the problem of the actual stop and arrest of Daniel Martinez in the first place. Officer Weber concedes in his testimony that he asks Daniel, what's your name? And Danny says, Daniel Martinez. And then he tells Daniel to put his hands behind his back in his own home. And he concedes that he was only doing that because he wanted Officer Nunez to have a chance to come and see if he could identify Daniel as the suspect they were looking for. Well, there's no other description of an event like that other than a Terry stop, which is expressly barred by the Fourth Amendment. And under the authority of people beware, officers could not do Terry stops of citizens inside their own homes. They either have probable cause to arrest them or they don't. And on that point, the defense again shifted to trial because of how they got caught during discovery. They said, well, we did have probable cause. He was a long-haired Hispanic. It doesn't matter that he had a red shirt instead of a gray shirt. It doesn't matter that he was in 2622 West 55th instead of 2624 West 55th Street. It doesn't matter that his name was Daniel and not Alberto. He had the last name of Martinez and he had long hair. Well, your honors, if the police are suggesting that they could have arrested and conducted a full blown arrest of any person within their two block perimeter, we had long hair. That's absurd. They couldn't do that. The only thing that Officer Weber could have done while he was in that house was stop Daniel and try to see if he was the guy that Officer Nunez and Salazar were searching for. He had no way to do anything else because his defense of arresting the wrong person is that he didn't hear any of the conflicting information come over the radio that would have conflicted with his probable cause determination. And again, this trial sort of blossomed out of control because of these shifting defenses that were not appropriately presented at the right time. In fact, on the numerous justifications for the arrest, the defense, the only thing consistent about what they presented is that they're trying to abuse what is an ambiguous resisting arrest statute to try to justify what happened here. They say that even if the search was not justified because of the presence of 10 to 15 officers, when he steps away from Officer Weber after being told to put his hands behind his back and Weber concedes that Daniel did not know what was going on, that that's resisting and he can be arrested. But that's not the case. In fact, there's a long line of authority that is collected by a district court in the Central District of Illinois under Scooby-Coyster, which is 120 F sub 3rd 825, that arguing with an officer, even for a somewhat extended period of time, not obeying commands, even some nominal things like stepping away is not actually a crime of resisting. It requires something much more than that. So along those lines, there's authority in Illinois under People v. Young, which was a case from 1960s. It was a long time ago. But in that case, the police went into a multi-unit building and they executed a search warrant on the wrong unit that had the same last name as the unit they were looking for. And the individual in that house struck the officer, battered her with her fist and attacked the officer with a ketchup bottle. And the Illinois Court of Appeals said that that was fine because the officers were conducting an illegal search. There can be no doubt that you are not allowed under the statute to resist even a lawful arrest. But Officer Weber was not arresting Daniel Martinez. In that case, what was the search based on? I'm sorry, what was the weapon? What was the search based on? What was the offense that they were looking for? I don't actually remember what the warrant was. Well, here we had an armed event. Yeah. At one point, there was an armed person who threw a gun. The police did say during the trial that in their experience, sometimes people with one weapon have two. Again, that was sort of speculative. But it may have been different in that respect. But again, it doesn't matter. They say that about police, too. It doesn't matter, though, because at the end of the day, Officer Weber is standing in this man's living room, and he's challenging his authority. And he's suing this officer for civil rights violations at the time arising from another event in 2008 that's ongoing. And this is, in fact— Is there an indication that Daniel has recognized the officer and the officer recognized him or vice versa? No, no. But what Daniel does know is that he's suing a lot of officers who work in his district. In fact, in the previous incident in 2008, his mother, his father, his uncle, his brother, and his best friend and himself were all arrested and physically abused. And four of them were maliciously prosecuted, and the city did settle that case sometime after his arrest in this one. So he has the information he has. It's the third time that his home has been unlawfully invaded by the police in the last several years. And he sees this man standing in his living room, and he reacts the way that he thinks he should, and I think within the limits of what he's allowed to do. Pulling away, stepping away, not cooperating with an officer who's attempting to handcuff him without any explanation as to what is happening or why he's being handcuffed in his own home or any understanding of the circumstances does not make him a criminal. And on this point, it's important because at some point, Officer Nunez comes and says, you got the wrong guy. And there's disputed evidence in the record that another officer named Bogdanoff said we'll take him to jail anyways. And they did. They took him to jail and they charged him with four inconsistent criminal charges. They charged him with two counts of resisting for pulling away and two counts of obstructing for blocking their access to a room. And as was flushed out during the case, that doesn't make any sense. They could not have been trying to find the right guy and knowing Daniel was the wrong one and he was blocking their access to a room. While at the same time, they thought they were arresting the right guy and he was pulling away. These are inconsistent, and they admit it. And that's why at trial, they were forced to concede that the second obstruction charge was done for different reasons. Weber says like five different reasons why he charged him with obstruction. He can't keep his story straight. Chavez says, well, I charged him with obstruction because I got radioed away from the search I was doing by Officer Weber. You can't say there's not malice or there's probable cause for a prosecution because what we really meant to charge them with isn't even a criminal act. That's not a defense. That's an excuse and a desperate effort to avoid liability in a case where it was clearly established that they should have been. Now, these various rationales or justifications that are being offered during the course of the trial, those are all then argued before the jury. And the fact that they've shifted and the fact that they're different and the fact that they may contradict, those all are explored, I assume, both in cross-examination and during closing argument, correct? Yes, Judge. It absolutely is. The problem is at some point, their burden is to come up with some kind of prima facie case. Here's our justification for why we did what we did. It's a warrantless action by the police, and our job is to carry the burden of persuasion and tell the jury why that didn't happen. But when they start coming up with all these last-minute defenses and our burden to persuade the jury becomes, well, we've got to disprove this defense and disprove that defense and disprove this defense, and they get all these instructions in all these different areas, and they're arguing that if I get radioed away from a search I'm doing in an alley, I'm obstructed, which is not legal. It's not a legal basis to charge anyone or arrest anyone for anything. It becomes very confusing for a jury to wade through all of that and figure out who's supposed to prove what and what are the facts and what am I allowed to find here? So that's why we've challenged the court's framework for this under Bogan v. The City of Chicago is because they have to do more than just come up with some defense. At some point, they have to be required to live with what they said in the first place. When they come up with a justification and it is disproven, they should lose. When it was disproven that 10 to 15 officers were not in the house, they should lose. They don't get to come up to trial and come throwing out three or four more justifications. Well, the 10 or 15 officers was suggesting they set up a perimeter around the area, right? The 10 to 15 officers were in the house, according to officers. No, no, I'm talking initially. There's radio contact that they set up a perimeter around the area, around that particular building. By the time that Weber arrived, correct. Before he arrived, there were numerous officers inside the other unit where Danny didn't live. And then they had left that unit because they were seen running out the back and he jumped the fence. So they were in one unit and he ran out of the other unit? No, he ran through the same unit. He ran in the front door and he came out the back door. So I see that I have two minutes left. I would like to reserve the rest of my time for rebuttal. Thank you. Thank you. Ms. Luce. Good morning. May it please the court. In this case, the jury heard from numerous witnesses about the role of Officer Weber and Officer Chavez in the pursuit of a gun offender and the arrest and prosecution of Daniel Martinez. The jury returned a verdict for the defendants on all counts. This morning, I will explain that the district court properly denied Daniel Martinez' motion for judgment as a matter of law and for a new trial on each of these claims. Each claim is supported by the evidence and the jury instructions were proper. Beginning with the unlawful entry and search claim, here there is ample evidence showing exigent circumstances to enter and search the building at 55th and Talman for— Let me ask you. Officer Weber went inside initially. Was anybody with him when he went in initially? He testified that there were officers inside. No, I understand that. Going in with him, no. Just answer my question. When he went in initially, was there anyone with him? Not who was there. Who was walking in with him? Yes. No. He and his partner arrived. His partner went to the yards and he went into the building. And then what happened? And then he went in there for a few minutes and he was searching from room to room in a residence that he believed was one residence. And he said at one time that there were 10 to 15 other officers. He did say there were 10 to 15 other officers. So did, by the way, it's not true that his testimony is entirely uncorroborated. Officer Chavez said the same thing, that there were 10 to 15 officers inside. And the jury heard this testimony and heard plaintiff's arguments for why they should deem Officer Weber not credible. But it fell to the jury to decide what the truth was here. And here I've heard opposing counsel keep saying that the defendants have shifted their argument somehow from the fact that Officer Weber saw 10 to 15 officers when he went in the Talman door to a defense where they were mistaken about whether it was one or two units. As if our defense were one or the other. It is not one or the other. It's all part of the same narrative. There were lots of factors that contributed to whether the search, the entry and search were reasonable. Now, when there was a radio communication about setting up a perimeter, were those officers that we know in the evidence, those officers, other 10 or 15 officers involved in a perimeter, setting up a perimeter? There were other officers setting up a perimeter to make sure that the offender did not escape. There were other officers in the building. This is a fast-moving event, of course. So this all takes place within a matter of minutes. I understand that. That's why I'm asking you about the 10 or 15 officers. Right. Well, there were probably more than 10 or 15 officers that responded to form the perimeter. But, yes, he testifies he saw 10 to 15 officers. I think Officer Chavez says he sees 5 to 15 officers he sees on the inside. And that's in the transcript at 316. He goes in. He starts searching room to room. And he hears over the radio a female officer saying, coming back in through the back. And that's really close in time to when he encounters Daniel Martinez. So for purposes of the unlawful entry and search claim, the jury heard testimony. It isn't true that this was abandoned at trial. The jury heard testimony that he saw officers inside the Talman entrance and also heard testimony that he believed this residence was the same one that the offender had really run through, had already run through. And that was significant that he believed this was all happening in the same place. He believed the offender had been in the unit that he entered. When he was addressing Daniels, were there other officers present? Regardless of whether you believe that 10 or 15, were there other officers there that he knew? When Martinez entered and he encountered him, no, he says there were no other officers in there until Officer Chavez comes around the corner. Now, somehow my opposing counsel thinks that this evidence about whether or not there was a mistake about the residential units is irrelevant and challenges the jury instruction about mistake, which was reasonable but mistaken factual judgments by police do not invalidate otherwise reasonable searches. This instruction was important, and it certainly is mystifying to me how my opposing counsel thinks it's irrelevant. The very first sentence in the plaintiff's opening statement was, the police arrested the wrong person in the wrong house. And that was a running theme throughout trial. It was highly relevant to the officer's defense to explain why it was reasonable for Officer Weber to go into Daniel Martinez's residence to explain why he reasonably believed he had gone into the right one. And so the jury heard lots of testimony about this. On the plaintiff's side, he talked a lot about the address over one door versus the address number over another door. Officer Weber said he wasn't paying attention. He showed up. It looked like one house. The jury saw a picture of that house. It's in the record at R-289, common design, common backyard. And my opposing counsel here said he didn't go in the backyard. But the fact of the matter is he parked several houses beyond the house. You can see that on the dash cam, and he's walking back to the house. So he can have a concept of this common backyard and common garage. So he's going into the unit that he believes is that there's only one unit, one residential unit in this building, and it's the one that the gun offender had run into. The records show from what direction the officer approached the house? From what direction the officer approached the house? Yes, in his vehicle. Did the vehicle approach from which direction? The vehicle rode down 55th Street and turned onto Talman and went a few, you know, he had to pass some other officers. So he had passed the other officers on the other side of the house in approaching the scene? Yes, there was a, I believe there was a police, it's on the dash cam video. Thank you. And then he went back into the house. And at this time, no one had, Officer Nunez did say it was possible that the offender had jumped over the fence, but Officer Nunez hadn't seen that. He had been told by someone in Alberto Martinez, the sister in Alberto Martinez's residence, that he had gone towards the back. So he didn't see. Does the record indicate that there was any superior officer present directing these various patrol officers as to what they were to do? They had set up a perimeter, some officers were going through the house, et cetera. Was anybody giving directions? No, at this point, you know, this is a very fast moving situation where Officer Nunez had started a couple blocks away and had chased him into this house. And this was within minutes after that. And Officer Nunez was the one saying, you know, talking about a perimeter and informing everyone, whether he's gone into the house. In these cases, the litigants in these cases seem to overlook the importance of authority among the police officers, it seems to me. That's why I asked, you know, would you have been in a lot better shape if there had been a superior officer telling you to do certain things? Sure. But the fundamental question here is whether a reasonable officer in Officer Weber's position, knowing what he knows. And not having received any guidance from above. Well, you know, no, he received the guidance he received over the radio from the dispatcher and from Officer Nunez, which was, you know, man with a gun, use caution. He's gone into this house, you know. But the dispatcher didn't tell him what to do when he arrived at the scene. No, the dispatcher is telling him the information that she's getting at the time, which is a description, which includes he's a male, he's Hispanic, gray shirt, blue jeans, ponytail, and is relaying that information as these events are unfolding. So the officer is supposed to make this, really decide what he's supposed to do on his own when he first arrives? Is that right? When he first arrives, he is going to the house where Officer Nunez has asked for assistance. The last place that the offender has been seen. I see. When the car pulled up with Bueller and Weber, Weber, first thing he did was went inside Daniel's house, right? Yes. Officer Weber? Yes. Which he believed to be the house that the offender had run into and last seen. So, and with respect to the jury instruction about the need. And that's when the discussion with regard, not discussion, the argument about get out of here and the resistance took place. A few minutes after that, he got out of the car around 3.50 and Daniel Martinez was in custody around 3.54, you know, give or take a minute or two, but that's what the timing on the dispatcher. When he called for help because he said he couldn't hold him down, he had to totally get on the ground. That was near the end of that. So I will turn to the unlawful seizure claim since that's what we're talking about here.  Essentially what he was going to do was to detain Daniel Martinez for identification because officer Nunez was nearby. And Martinez argues that the officers can't do that because the conduct, that's an investigatory stop in the home. We submit for one thing that officer Webster had probable cause at this point to arrest Daniel Martinez as the offender. But the only authority that plaintiffs rely on for the idea that you can't temporarily detain once you're in the home, assuming you are in the home because you have a reasonable, probable cause that someone who's committed a crime is in there and you have exigent circumstances. Once you are in there, the only case he relies on for not being able to do an investigatory stop is people versus where, where the issue there was whether an officer can enter and search for the purpose of an investigatory stop. And here the issue is not whether or not Webster entered and searched for the purpose of an investigatory stop. The purpose was to search for and apprehend a fleeing offender for whom there was probable cause to believe had committed a crime. And so when he runs into Daniel Martinez, he actually does have probable cause to believe Daniel Martinez has committed a crime. And the detention is justified on that basis. He is in the place, he's in the building where the offender is last known to have been seen, and he fits key aspects of the description. He's male, he's Hispanic, he's wearing his hair in braids or a ponytail, he's in blue jeans. Officer Weber asks his name and he says, Daniel Martinez. Weber remembers the name Martinez having come over the radio. And he's in the place that Officer Weber reasonably believed to be the residence where the gun offender had last been seen. And Daniel Martinez is behaving like someone who is still fleeing, yelling obscenities and heading to the door. He's reaching for the door. Even Daniel Martinez acknowledges that. Ms. Luce, going to that timeframe, I think you said 350 to 354. It's in that timeframe. Probably close to the end of that timeframe. How much or what does the state say that Dennis Martinez did to disrupt the search for Alberto Martinez? I'm sorry, how much? Does the state say that Dennis did to disrupt the search for Alberto, who was eventually found out in the garbage can? Well, the theory of obstruction there was that he, in not cooperating and resisting arrest, pulled the two officers away from the search for the real offender, for Alberto Martinez. And turning to the obstruction charge, the jury was instructed on the statute pertaining to obstruction, which is a person who knowingly resists or obstructs the performance by one known to be the person to be a peace officer of any unauthorized act within his official capacity. And obstruction includes any conduct that the effect of which impedes or hinders the progress. And that includes disobeying an official's command and refusing to further comply. So probable cause for obstruction existed here because Officer Weber ordered Daniel to put his hands behind his back, and Daniel did not comply. And he resisted. He pulled away and he flailed his arms. And, yes, so Officer Weber asked for assistance, and that did pull Officer Chavez away from his search in the backyard. I mean, his lack of cooperation really did take two officers away from the police work that they were there for. And the jury could reasonably conclude that that was obstruction, that the officers had probable cause for obstruction. And we submit that when he was arrested, Officer Weber had probable cause for three different crimes. For the gun offense, which I discussed before, based on the key aspects of the description that Daniel Martinez fit in the location and his behavior. Resisting a peace officer, that's the pulling away and the flailing. That's sort of a classic example of resisting and obstructing a peace officer, as I've just explained. Now, in terms of my plaintiff emphasized, plaintiff's counsel emphasizes the novelty of this, but we submit that the facts of this obstruction charge is not meaningfully different than in cases where courts have upheld obstruction charges based on the refusal to comply with an order that takes away, takes an officer away from his police work. We cite several examples on page 37 of our brief, refusing to comply with an order to disperse, for example, was obstruction. Refusing to comply with an order to get back in the car was obstruction. Refusing to comply with an order to leave a traffic scene was obstruction. And we submit that refusing to comply with an order to put your hands behind your back is in the same vein. And with respect to the malicious prosecution claim, again, we submit that there's ample evidence from which the jury could conclude that the officers had probable cause to prosecute Daniel Martinez for resisting arrest and obstructing for essentially based on the same evidence that supported his arrest for that. And also the evidence supported the jury's conclusion that the officers lacked malice in pursuing the charges. With respect to the errors in the criminal complaint that my opposing counsel mentions here about in the written criminal complaint, there were words to the effect of that Daniel Martinez interference included blocking access to a room rather than by taking the two officers away from the search. And we submit to you that the jury also heard the officers' explanations that blocking access to a room was a mistake, but what really had been done was hindering the search for the suspect that was still at large. The jury heard all of this, saw the demeanor of the witnesses, and the criminal written charges were, of course, not the only evidence of probable cause to prosecute for those two crimes. The jury heard all of it and their conclusion. How much video was there? Were there body cameras? There were not body cameras on. There was a dash cam video, and that's the only video in the case, which is in the record. There is a lot of communication over the radio on tapes that are in the record. And the jury heard all of that. Continue your thought, and I'll get you that. And the jury heard all of that. And so drawing all inferences in favor of the verdict, as must be done for a motion for a new trial, the evidence amply supports the jury verdict in this case on the malicious prosecution claim as well. Ms. Luce, on the warrantless seizure claim, you'd be okay if you only had reasonable suspicion. You didn't need probable cause, am I right? Reasonable suspicion to hold him for identification purposes, yes. We submit that's the case. Given the amount of activity going on, the officer could have held him until things settled down and they figured out whether this was the guy or not, right? Right, and that's what he intended to do. I mean, I submit that there was probable cause to arrest, but what? But you don't need it. But we don't need it. And obviously what Officer Weber was intending to do was, you know, a logical, practical thing here, which was detain him. He knew Officer Nunez was nearby. It would have been easy to bring him around and make that determination. So that's what he intended to do. And that would be sufficient. And as I said, I don't, the cases that my opposing counsel relies on, I mean, of course, that's the very reason he went into the building was to find out, find the offender. If he has someone who looks like him and there's reasonable suspicion, of course he has, he's reasonable, he's acting reasonably to detain this person for purposes of identification. I don't believe my opposing counsel has really argued this morning for this court to revisit Bogan as he did in his brief, but we submit he has not even made the most bare bones attempt to meet the standards this court has for overruling precedent. And so this court should reject his invitation in the brief to revisit Bogan. If there are no other questions. I did have one or two. There are no claims in this appeal with regard to Officer Boga DeLac. Correct on appeal. Plaintiffs have raised no claims, have not challenged the verdict in favor of Officer Boga DeLac. Was she the officer that didn't appear at trial? She appeared at trial. She did. She did. She appeared at trial and she testified and plaintiffs do not appeal judgment in her favor on the, she was on the malicious, malicious prosecution, retaliation and conspiracy claims. Officer Chavez is only on a malicious prosecution. Right. I believe that's correct. Oh, he, he was also a part of the arrest. Right. That's right. So if there are no further questions, we do ask that the judgment of the district court be affirmed. Thank you. Thank you. Was that, was counsel correct in the, with regard to who the parties are Boga DeLac, the female officer is not in this appeal. No, Your Honor. What we're appealing is that because of the shifting nature of the defenses that were offered, the jury was confused and prejudiced by all of the evidence that was offered on all of these miscellaneous defenses. To be fair and to clarify, there was no specific issue with respect to this Boga DeLac that we have challenged district court ruled against us on, except to the extent that the trial was made unfair by the presentation of all these conflicting evidence. We did raise in the brief under the challenging the Bogan standard, the problem with her testimony, which was at first, I remember nothing about this case. And then she showed up at trial and remembered key aspects that supported her defense, which was problematic, but that, but that is not, we are not challenging the district court's ruling on not sanctioning her for presenting her witnesses to us pre-trial. Obviously that would be an abusive discretion standard. So what's the answer to my question? The answer is, is we're claiming that we should be given a new trial as to all of our claims on the basis of everything. As to her as well? Yes, Judge. And how about Chavez? Is he just on a malicious prosecution? No, Your Honor. He was, he was sued for the search because there was evidence that there were two officers inside the house at the time that Weber entered and the arrest and the seizure and everything else. So, um, uh, all right. If I may, I'll give you the time and we just. Thank you. Listen, this court needs to reject the idea that there's probable cause because an officer gets radioed away from their assignment. That is absurd. There is no authority for it. The court needs to reject it. It was argued at trial. It is legally baseless. Um, there, there is no authority for it. It's not ambiguous about, there's nothing ambiguous about this. An officer who radios away for help because the guy, a person in the house is arguing with him. And, uh, you know, that that's just not a basis to charge anyone with a criminal act. Um, it's not just whether or not an officer is obstructed. Otherwise, every time you ask for directions to a police officer, you're obstructing him in some kind of capacity. That's not a crime. Um, he's allowed to argue with the officer about why he's in his home and he's allowed to protest the fact that he's in his home. Um, that's not obstruction. Uh, and the court, um, should also reject the idea that, uh, officer Weber is allowed to present all of these numerous defenses at the 11th hour after he got caught. Well, we've, we've prescribed a lot of, uh, conduct that constitutes obstruction, right? In Abbott. Yes, judge. Absolutely. Um, there is a lot of things that can constitute obstruction, but one officer radioing another officer for help is not one of those things that's prescribed. It's unambiguous. And officer's actions and trying to get help because a guy who's suing the defense, the officer who's in the house. Oh, I'll drop the suing thing. He's got one handcuff on. Like he can't get the other hand. Well, but, but radioing, but that does not make the other officer a victim of obstruction. Otherwise you're saying that the dispatchers who hear the radio call and have to call for help are also obstructed. Well, he was still, I still had one handcuff on when the other officer showed up, right? It took two officers to get the handcuffs. And that's what they're describing is resisting arrest. This is not blocking access to a room. They're not hindering his search. He has no idea search is going on. And whoever concedes that it can't be as a matter of law obstructing. Um, when you are, when you are confronted by an officer in your home and you argue with him and the ambiguous circumstances, the officer says, put your hands behind your back and you protest. That's not resisting or obstructing that's allowed. Um, he's in his own home. And, and while, uh, the judge asked about whether there was reasonable suspicion required or probable cause, um, inside the home, a stop cannot be initiated inside of his home without probable cause. The fourth amendment is unambiguous about that. It's in this text of the statute itself. Um, there cannot be investigatory stops inside someone's home. He has to have probable cause. The concept of a hot pursuit is that it's immediate and that it is continuous. And that did not happen here. Weber shows up after all the other officers have left the building. He searches and he enters the home. Um, at that point of search was, was over. Um, I wasn't over, but it was, it was, they didn't know where the suspect was. They certainly didn't have probable cause to think that he was in the other unit in the building. Uh, thank your honors. And if there are no further questions, thanks to both counsel in the case has taken under advisement.